ORVEN E. LUTTRELL, Appellant and Cross-Appellee, v. THE INDUS-
TRIAL COMMISSION *et al.* (Central Wisconsin Transport, Inc., a/k/a C. W.
Transport, Inc., *et al.*, Appellees; Truck Transport Company, Appellee and
.Cross-Appellant).

Second District   No. 2—86—0364WC

Opinion filed April 27, 1987.

Patrick M. Flaherty, of Thompson & Lamont, of Aurora, for appellant.

Philip J. McGuire and Joseph V. Dowd, both of Dowd & Dowd, Steven H. Shanok, of Kane, Doy & Harrington, and James R. Clune and Thomas J. Mallers, both of Sweeney & Riman, Ltd., all of Chicago, for appellees.

JUSTICE KASSERMAN delivered the opinion of the court:

On February 3, 1981, claimant, Orven E. Luttrell, filed an application for adjustment of claim under the Workers' Compensation Act (Act) (Ill. Rev. Stat. 1981, ch. 48, par. 138.1 *et seq.*), alleging that he suffered from bilateral carpal tunnel syndrome as a result of repeti-

tive trauma incurred as a truck driver and dockhand while employed by Central Wisconsin Transport, Inc. (Central Wisconsin Transport). On April 29, 1981, claimant filed two more applications for adjustment of claim under the Act, alleging that the carpal tunnel syndrome was a result of his subsequent employment as a truck driver with respondents Grow Mart, Inc. (Grow Mart), and Truck Transport Company (Truck Transport). The cases were consolidated before an arbitrator for hearing on May 11 and 12 and July 13, 1982. Before claimant rested his case before the arbitrator, he requested that his claims be considered under the Workers' Occupational Diseases Act (Ill. Rev. Stat. 1981, ch. 48, par. 172.36 *et seq.*) rather than the Workers' Compensation Act. The arbitrator granted the request.

On August 11, 1982, the arbitrator entered his decisions denying compensation. This decision was affirmed by the Industrial Commission and the circuit court confirmed the decision of the Industrial Commission. The claimant has taken this appeal and respondent Truck Transport has taken a cross-appeal.

The issues presented on appeal are: (1) whether claimant failed to properly perfect his review, thereby depriving the court of subject matter jurisdiction, by filing a *praecipe* for writs of *certiorari* and *scire facias* rather than a request for summons (respondent Truck Transport's cross-appeal); (2) whether claimant's carpal tunnel syndrome is a compensable "occupational disease" within the meaning of the Workers' Occupational Diseases Act; and (3) in the alternative, whether claimant can now pursue a remedy under the Workers' Compensation Act.

■ In addition, we have taken for decision with this appeal claimant's motion to strike Truck Transport's reply brief. In this regard, Truck Transport has raised in its answer brief the issues involved in its cross-appeal. Then, after claimant filed his reply brief, Truck Transport filed a "response" brief which contained argument only on the original issues raised by claimant. Truck Transport's reply brief was therefore in violation of Supreme Court Rule 343(b)(i) (87 Ill. 2d R. 343), which requires that a cross-appellant's reply brief be "confined strictly" to replying to appellant's (claimant's) arguments on the cross-appeal. Claimant's motion is therefore granted, and we will not consider Truck Transport's reply brief.

The evidence presented before the arbitrator was as follows: Claimant has been a truck driver since 1948. He worked for Central Wisconsin Transport from July 17, 1971, until he was laid off on November 2, 1979. He drove tractor-trailers with 5- or 10-speed manual transmissions, shifting with his right hand and steering with his left

hand. He also worked as a dockhand, moving freight with a lift truck and a hand truck. Claimant testified that he worked eight hours a day on the average, 30% of the time as a driver, the remainder as a dockhand.

Claimant testified that prior to his employment with Central Wisconsin Transport he had no problems with his hands or wrists. However, in 1974 claimant noticed that his hands had a tendency to go to sleep on the steering wheel. He also noticed that his hands were extremely sensitive to the cold.

Claimant first sought medical attention for the problem from a chiropractor in 1974 or 1975, but got no relief. He subsequently went to a neurosurgeon, Dr. Baumann. Claimant requested permission from Robert Abbey, his immediate supervisor at Central Wisconsin Transport, to enter the hospital for tests. Medical records indicate that claimant was admitted to the hospital on July 18, 1974, complaining of pain, numbness, and weakness in his hands and arms. A myelogram was performed and Dr. Baumann diagnosed cervical disc disease. However, the discharge summary indicates that claimant felt that he did not want surgery at that time.

By the end of 1979, claimant's hands were bothering him periodically during the day and pain awakened him at night. Claimant testified that he had informed James Bodkins, the night dispatcher at Central Wisconsin Transport, of these problems once every month or two for five years.

After his layoff from Central Wisconsin Transport, claimant applied for a job with Grow Mart in March 1980. In the meantime, he worked in an insurance business which he owned. Claimant testified that when he wasn't active as a truck driver he had some relief in his hands, unless he was driving his own car, in which case his hands would go to sleep or tingle a bit. However, claimant also testified that he had no difficulty in the week prior to starting work at Grow Mart.

At Grow Mart, claimant worked as a truck driver. He drove Mack trucks and Internationals, with 5- or 10-speed manual transmissions, pulling anhydrous tanks. The unloading process required claimant to drag a pair of large hoses off the truck and hook them between the truck and a receiving tank. The hoses weighed 75 pounds, were four inches in diameter, and were approximately 20 feet long. The hoses were so cold that they had frost on them. Claimant was required to tighten a large nut on the hose first by hand, and then by using a hammer.

Claimant testified that he drove considerable distances for an hour or two at a time for Grow Mart and that his hands would be-

come numb and would hurt. He also testified that while handling the hoses, his hands would become numb and hurt even though he was wearing gloves. During his employment, he did not inform any supervisory personnel at Grow Mart of the problems he experienced. Claimant testified that at this time it was getting so that he could not distinguish coin denominations by touch. The problem was worse in his right hand.

Claimant's last day of work for Grow Mart was June 28, 1980. He initially testified that his hands were not bothering him as much while he was not working except that they caused him to wake up a few nights and except for a little numbness while driving his car. However, he also testified that while looking for employment after leaving Grow Mart, his hands would go to sleep on the steering wheel of his car and his hands would wake him up quite painfully. He also described having trouble holding a cup of coffee or a soft drink, and he stated that his hands hurt and trembled even while reading a newspaper.

Claimant started work for Truck Transport in August or September 1980 as a driver. He drove a Mack truck with a five-speed transmission for eight or nine hours a day. His duties included disconnecting hoses from the trailer, turning the crank, and pulling the pin to disconnect the trailer for unloading. He noticed the same problems with numbness in his hands while driving and also pain waking him up at night. However, claimant apparently did not inform anyone at Truck Transport of the problems he was having until after his first operation in January 1981.

On December 22, 1980, while claimant was sleeping in the sleeper part of the truck, his partner was involved in an accident. Claimant suffered a compression fracture between his shoulder blades and injuries to his head, neck, hip, leg, and tongue. A gash in his hand required stitches and he spent three days in the hospital. Dr. Player, his treating physician, recommended tests for the nerves in claimant's hands. The tests led to Dr. Player's diagnosis of bilateral carpal tunnel syndrome and ultimately resulted in operations on both of claimant's wrists. Claimant testified that he first learned of the condition of his hands and received a medical opinion as to the cause of the condition in his conversation with Dr. Player after the truck accident. In January 1981 Dr. Player performed surgery, a carpal tunnel release, on both of claimant's hands. He was released to work on April 6, 1981, and was still working for Truck Transport as a driver at the time of the arbitration hearing.

Claimant testified that, at the time of the hearing, his right hand

no longer woke him up at night and did not go to sleep on the steering wheel. Also, he could feel coins and could grasp objects. However, he noticed that the hand was not as strong and was tender to the touch. With respect to his left hand, it also did not fall asleep on the steering wheel any longer, but it was weak and tender in the palm.

On cross-examination by counsel for Central Wisconsin Transport, claimant identified his signature on his application for adjustment of claim, which stated "[t]erminal manager advised as soon as diagnosis and causation became apparent." However, claimant testified that the time that he talked to Mr. Abbey, the terminal manager, about his condition was after one or both of his surgeries. Claimant also admitted that he received unemployment benefits after being laid off from Central Wisconsin Transport but before his employment with Grow Mart. He stated that he had indicated to the State at that time that he was ready and available for all kinds of work, and he did not tell the State that he had any problems with his hands. Central Wisconsin Transport also presented a group exhibit consisting of the reports of five physical examinations of claimant. The examinations were made every two years, apparently as required by Federal commerce regulations, from 1971 to 1979. The reports included a medical examiner's certification and were signed by claimant. None of the reports gave any indication of any problems claimant was having with his hands.

Claimant also testified that he did some gardening, lawn work, and some carpentry and painting. He stated that he had recently moved from one address to another and that he had helped move some of the household effects. He testified that he liked to fish as a hobby and that he owned a 1973 Chevrolet pickup, which he kept tuned himself. Claimant testified that, while working for Central Wisconsin Transport, he drove 16 miles to and from work five days a week at first, then 1½ miles each way later. While working for Grow Mart, he drove 12 miles each way five days a week, and he drove 61 miles each way two days a week while he worked for Truck Transport.

Claimant then presented the evidence deposition of Dr. John Scott Player, an orthopedic specialist. Dr. Player examined claimant after his accident on December 22, 1980, and found a compression fracture in his back. The doctor also documented a positive Tinel's sign and a positive Phalen's sign, which usually indicate carpal tunnel syndrome, and he also documented a severe wasting of muscle mass of both hands, the right hand being worse than the left. Dr. Player testified that the injuries sustained in the truck accident would not have caused or aggravated the condition he found in claimant's hands. The

doctor testified that X rays revealed degenerative changes in claimant's spine which could possibly cause claimant's condition. He also stated that subsequent nerve conduction studies were compatible with carpal tunnel syndrome. The doctor believed that the carpal tunnel syndrome was the cause for claimant's hand wasting. The doctor also described the two carpal tunnel releases performed on claimant in January 1981. The surgical result confirmed his diagnosis of bilateral carpal tunnel syndrome.

In response to a hypothetical question, Dr. Player testified that it was his opinion that claimant's employment "probably contributed to the bilateral carpal tunnel syndrome." However, Dr. Player qualified his opinion by stating that "manual labor, manual effort of any kind *** can contribute to this problem." Dr. Player testified that claimant's employment with each employer did aggravate the condition, as would any hobbies involving manual effort.

Dr. Player testified that claimant had excellent results from the surgeries, which meant that he had no further night pain and little trouble with numbness and tingling. Claimant apparently still had some discomfort from the compression fracture. The weakness in the hands might or could be permanent as a result of the progression of the syndrome. The tenderness of the palms is probably the result of the incisions and might or could be permanent.

On cross-examination, Dr. Player testified that "carpal tunnel syndrome is a neuropathy, which is a problem with the nerve caused by pressure, usually, at the wrist. This causes a slowing of the electrical impulse transmitted down the nerve, which then causes complaints of numbness, tingling, and weakness. It causes wasting of the muscles and loss of function with pain." The doctor further testified that he believed "the most attractive theory at the moment is that the carpal tunnel is what is called a closed space, that the tendons running through the carpal tunnel have a lining about them called synovia which becomes inflamed, achieving an increase in the size for each tendon which occupies that space." Dr. Player stated that rheumatoid arthritis, gout, repeated trauma to the hands, or repetitive actions performed by the hands could irritate the synovial lining. He stated that surgery cures the problem rather than discovers the cause. Dr. Player testified that it has been documented that there is an association between manual trauma, e.g., banging of the hands, wielding a hammer, bumping, twisting, and turning, and carpal tunnel syndrome. Spanking a child, driving a truck or a car, changing a tire, gardening, and fishing all could contribute to or aggravate carpal tunnel syndrome.

Dr. Player testified that claimant's symptoms became most severe six months before he first saw him, which suggested the need for surgery. Dr. Player also testified that the syndrome is not something that everyone develops over time. Although he recognized that flexing the wrists while sleeping is a positive Phalen's sign and that splinting the wrists at night might relieve the pain, he admitted that he did not inquire into claimant's sleep habits and did not suggest splinting. Dr. Player rejected an alternative treatment suggested by defense counsel, injections with corticosteroid, stating that such treatment is inappropriate where symptoms are severe and muscle wasting has occurred. Dr. Player suggested that while patients without muscle wasting might be able to spontaneously correct the problem, spontaneous remission was not probable in claimant's case. The doctor stated that muscle wasting in claimant's case could have been present as early as 1976.

Finally, Dr. Player testified that carpal tunnel syndrome is not a disease because calling it a disease "would imply that there was a definite cause creating a definite known ill effect." In the case of carpal tunnel syndrome, "the cause of the condition is not entirely worked out."

On the issue of notice, three letters were introduced into evidence by claimant. The first, dated January 20, 1981, was written by David M. Henschel, adjuster for the insurer of Truck Transport, to Dr. Player, requesting a narrative report covering his diagnosis and the cause of injury, specifically asking whether work-related. Dr. Player responded by letter dated January 26, 1981, explaining that the claimant suffered a compression fracture and informing Henschel of his diagnosis of bilateral carpal tunnel syndrome, which he stated to be "related to his occupation." By letter dated February 2, 1981, Henschel acknowledged receipt of Dr. Player's letter report.

Claimant's counsel then stated to the arbitrator that he believed that claimant had misconceived his remedy. Pursuant to section 19(a)(1) of the Workers' Compensation Act (Ill. Rev. Stat. 1981, ch. 48, par. 138.19(a)(1)), counsel requested that the case be considered under the Workers' Occupational Disease Act. The arbitrator granted the request, and the claimant rested.

James Bodkins, night supervisor for Central Wisconsin Transport, testified that if someone reported an injury or illness, it was his duty to fill out a supervisor accident report. He testified that he didn't recall claimant complaining that his hands were bothering him, except possibly during the winter that his hands were cold. He first learned that petitioner had a problem after the operations.

Respondent Truck Transport then presented the evidence deposition of Dr. John Louis Bell. Dr. Bell testified that he examined claimant on October 21, 1981, nine months after the surgery. Dr. Bell found "atrophy of the thenar muscles of the right hand [at the base of the thumb] as compared to the left," and "some tenderness on palpation along the scars on both hands." He stated that "[a]n Allen's test on both hands showed evidence of filling of either the radial or ulnar arterial arches." Dr. Bell found a decrease in sensation to a light touch and pinprick sensation on all fingers. Dr. Bell stated that carpal tunnel syndrome is "compression of the median nerve within the carpal tunnel, caused by anything that could increase the contents of the carpal tunnel, such as inflammation of the tendon sheaths, or anything that could cause a chronic swelling of any of the contents of the carpal tunnel." He stated that this could result from repeated trauma, rheumatoid arthritis, an old fracture of the wrist, or chronic edema from hyperthyroidism. Dr. Bell testified that he agreed with an observation made by Dr. George S. Phalen in an article entitled "Reflections on 21 Years' Experience With The Carpal Tunnel Syndrome" that flexing the wrists during sleep plays a large role in the production of carpal tunnel syndrome. Dr. Bell testified that he agreed with Dr. Phalen's observation that improvement after an injection of steroids is consistent with rheumatic origin of tenosynovitis. In response to a hypothetical question, Dr. Bell further testified that claimant's personal activities and night wrist flexion could have caused, aggravated, or accelerated claimant's carpal tunnel syndrome. Dr. Bell noted that claimant had no complaints or clinical signs indicating rheumatoid arthritis.

Dr. Bell initially testified that it was his opinion that claimant's employment with Truck Transport did not cause, aggravate, or accelerate the petitioner's bilateral carpal tunnel syndrome since claimant had the same symptoms prior to that time; however, he later testified that it was possible that claimant's employment with all three employers could have aggravated or accelerated the condition. Dr. Bell testified that there was an increased risk of developing carpal tunnel syndrome in an occupation that involves prolonged contact with a steering wheel or palmar pressure on two-wheeled dollies and that such work activity could cause carpal tunnel syndrome. He testified that each violent movement or pressure would probably increase the problem. A severe case of carpal tunnel syndrome could result in the wasting or atrophy of muscles in the hand. Dr. Bell testified that he believed claimant had the syndrome when he left the employ of Central Wisconsin Transport on November 2, 1979. Later he testified: "I

think that all of the work has kind of aggravated his—I mean, it has just continued this process."

Dr. Bell further testified that he did not consider the inflammatory process to be a "disease process" because it is "a swelling of a non-specific origin."

On August 11, 1982, the arbitrator issued his decisions denying compensation, finding in each case that claimant had failed to prove that he was last exposed to the hazards of an occupational disease while employed by the respective employers. The Industrial Commission affirmed and issued its decision on October 2, 1984, finding that: (1) "[p]etitioner failed to prove he was exposed to the hazards of an occupational disease because the facts relating carpal tunnel syndrome with the onset testified to by Petitioner does not constitute an occupational disease within the meaning of the Act"; and (2) "[p]etitioner failed to prove he sustained accidental injuries, or disablement from repetitive trauma constituting an accident arising out of and in the course of his employment within the meaning of the Act."

On October 25, 1984, claimant filed in the circuit court a *praecipe* for a writ of *certiorari* and writ of *scire facias*. Truck Transport filed a motion to strike and dismiss, urging that claimant's failure to commence judicial review by a summons directed to the Industrial Commission, as required by the amended section 19(f)(1) of the Workers' Compensation Act (Ill. Rev. Stat. 1983, ch. 48, par. 138.19(f)(1), as amended by Pub. Act 83–360, eff. Sept. 14, 1983; see also Ill. Rev. Stat. 1983, ch. 48, par. 172.54(f)(1)), rather than a *praecipe* and writs, deprived the circuit court of subject matter jurisdiction. The circuit court denied Truck Transport's motion but confirmed the decision of the Industrial Commission on April 9, 1986.

■ Truck Transport urges in its cross-appeal that claimant's commencement of judicial review on October 25, 1984, by filing a *praecipe* for writs of *certiorari* and *scire facias*, was not in strict compliance with section 19(f)(1) of the Workers' Compensation Act and that this failure deprived the circuit court of subject matter jurisdiction.

Prior to September 14, 1983, the party seeking judicial review in Workers' Compensation Act and Workers' Occupational Diseases Act cases was required to file a *praecipe* in the circuit court, requesting the issuance of writs of *certiorari* and *scire facias*. (Ill. Rev. Stat. 1981, ch. 48, pars. 138.19(f)(1), 172.54(f)(1).) However, Public Act 83–360, effective September 14, 1983, revised these sections. They now provide that the circuit clerk, upon written request, shall issue summons directed to the Industrial Commission and to the parties.

Our supreme court previously has stated that strict compliance with the statutory requirements is necessary to enable a court to acquire subject matter jurisdiction over a decision of the Industrial Commission. (*E.g., Daugherty v. Industrial Com.* (1983), 99 Ill. 2d 1, 5, 457 N.E.2d 381, 383; *Wabash Area Development, Inc. v. Industrial Com.* (1981), 88 Ill. 2d 392, 395-96, 430 N.E.2d 1002, 1003; *Boalbey v. Industrial Com.* (1977), 66 Ill. 2d 217, 218, 362 N.E.2d 286, 287.) However, in each of these cases the party seeking review failed to perform what the court considered a substantive requirement of the statute. In *Daugherty*, the judgment was vacated because the claimant failed to name a party in interest in the *praecipe*. (*Daugherty v. Industrial Com.* (1983), 99 Ill. 2d 1, 6-7, 457 N.E.2d 381, 383.) In *Wabash*, the judgment was vacated because the employer failed to exhibit to the circuit clerk a receipt for payment for the cost of the record. (*Wabash Area Development, Inc. v. Industrial Com.* (1981), 88 Ill. 2d 392, 398-99, 430 N.E.2d 1002, 1005.) In *Boalbey*, the dismissal of a claim was affirmed because claimant failed to file a *praecipe* for a writ of *certiorari* within the time set out in the statute. *Boalbey v. Industrial Com.* (1977), 66 Ill. 2d 217, 220, 362 N.E.2d 286, 287.

In the instant case, however, there is no significant distinction between a written request for summons and the *praecipe* actually filed. The *praecipe* stated: "To the Clerk of the Circuit Court: Please issue ***." Furthermore, the writ of *certiorari* and the writ of *scire facias* contain substantially the same information and served the same function as a summons. Receipts for delivery by certified mail to the Industrial Commission and the attorneys for the parties in interest acknowledging receipt of service appear in the record.

In *Berry v. Industrial Com.* (1973), 55 Ill. 2d 274, 302 N.E.2d 277, the claimant timely filed a *praecipe* and the filing fee, together with a copy of a letter to the Industrial Commission, indicating that the claimant had mailed a check for costs. The clerk called the claimant's attorney and was informed the probable costs had been paid, and the clerk also called the Industrial Commission and verified that information. (55 Ill. 2d 274, 275-76, 302 N.E.2d 277, 278-79.) The clerk then issued a writ of *certiorari* without requiring the exhibition of the receipt for costs as required by statute. The supreme court recognized that a party seeking review must comply with all the conditions prescribed by statute. However, the court found that a copy of the letter to the Industrial Commission and verification from the Commission was as effective as actual exhibition of the receipt for costs for the purpose of the statute, which was to coerce payment of the costs. The court held that the purpose of the statute had been ful-

filled. (55 Ill. 2d 274, 278, 302 N.E.2d 277, 279-80.) The court cited with approval *Republic Steel Corp. v. Industrial Com.* (1964), 30 Ill. 2d 311, 196 N.E.2d 654, for the proposition "that the tendency is to simplify procedure, to honor substance over form, and to prevent technicalities from depriving a party of the right to be heard." *Berry v. Industrial Com.* (1973), 55 Ill. 2d 274, 278, 302 N.E.2d 277, 280.

Admittedly, claimant herein mistakenly used outdated forms, but we conclude that the failure to file a request for summons does not deprive the circuit court of subject matter jurisdiction. The crucial point is that the goal and purpose of the statute was satisfied, *i.e.*, notice to the Industrial Commission and the parties. *Cf. Malone v. Industrial Com.* (1986), 141 Ill. App. 3d 116, 489 N.E.2d 1167.

We next consider claimant's contention that his carpal tunnel syndrome is compensable as an occupational disease under the Workers' Occupational Diseases Act and that the Industrial Commission's decision denying compensation is contrary to law and against the manifest weight of the evidence.

■■ Section 172.36(d) of the Workers' Occupational Diseases Act provides in part: "In this Act the term 'Occupational Disease' means a disease arising out of and in the course of the employment or which has become aggravated and rendered disabling as a result of the exposure of the employment." (Ill. Rev. Stat. 1983, ch. 48, par. 172.36(d).) Therefore, a claimant under the Workers' Occupational Diseases Act must prove both: (1) the existence of a "disease"; and (2) either (a) that there is a causal connection between the contraction of that disease and claimant's working environment (Ill. Rev. Stat. 1983, ch. 48, par. 172.36(d)), or (b) that claimant's working environment aggravated and rendered disabling a previously existing disease. See *Bunney v. Industrial Com.* (1979), 75 Ill. 2d 413, 422, 389 N.E.2d 536, 540 (the effect of the 1975 amendment to the Workers' Occupational Diseases Act).

The word "disease" itself is not defined in the Workers' Occupational Diseases Act and no Illinois case has come to our attention which has defined "disease" as used in the Act. Furthermore, we are aware of no Illinois case which has recognized carpal tunnel syndrome as a disease under the Workers' Occupational Diseases Act. Claimant urges us to adopt a broad meaning of "disease," suggesting: "an impairment of the normal state of the living animal or any of its components" (Webster's Third New International Dictionary 648 (1971)); or "an interruption, cessation, or disorder of body functions, systems, or organs" (Stedman's Medical Dictionary (5th ed. (1982))).

■■ When a term in a statute is not specifically defined, the term

must be given its ordinary and popularly understood meaning, but the term must also be construed with reference to the purposes and objectives of the statute. (*Niven v. Siqueira* (1985), 109 Ill. 2d 357, 366, 487 N.E.2d 937, 942.) We recognize that the Workers' Occupational Diseases Act is to be liberally construed and that it "is a humane law of a remedial nature whose fundamental purpose is to provide employees and their dependents prompt, sure and definite compensation, together with a quick and efficient remedy, for injuries or death suffered in the course of employment." (*General American Life Insurance Co. v. Industrial Com.* (1983), 97 Ill. 2d 359, 370, 454 N.E.2d 643, 648-49.) However, the adoption of such a broad definition as that suggested by claimant would also result in compensation under the Workers' Occupational Diseases Act for accidental injuries otherwise compensable under the Workers' Compensation Act, *e.g.*, sprained muscles and broken bones. Furthermore, we do not believe the legislature intended that the Workers' Occupational Diseases Act provide compensation for any malady. Had such been the intention of the legislature, there are a variety of other terms it could have used to better convey that intention, *e.g.*, illness, sickness, defect, ailment.

Occupational disease laws were designed to compensate employees for injury, disease, or death occasioned by slow, gradual, and insidious processes arising out of and in the course of employment. (*Allis-Chalmers Manufacturing Co. v. Industrial Com.* (1965), 33 Ill. 2d 268, 272, 211 N.E.2d 276, 278.) Historically, the Workers' Occupational Diseases Act has provided compensation for silicosis, asbestosis, pulmonary tuberculosis, pneumoconiosis (cases collected at Ill. Ann. Stat., ch. 48, par. 172.36, notes 13 through 17 (Smith-Hurd 1986)), hearing loss (Ill. Rev. Stat. 1985, ch. 48, par. 172.42), and exposure to radiation and berylliosis (see Ill. Rev. Stat. 1985, ch. 48, par. 172.36(f)).

In the case at bar, both Dr. Player and Dr. Bell testified that carpal tunnel syndrome is not a "disease" because, as Dr. Player stated, "the cause of the condition is not entirely worked out." Dr. Bell observed that carpal tunnel syndrome was a condition of a nonspecific origin.

■ In this regard, it is quite generally recognized that an "injury" is distinguished from a "disease" by virtue of the fact that an injury has its origin in a specific, identifiable trauma or physical occurrence or, in the case of repetitive trauma, a series of such occurrences. A disease, on the other hand, originates from a source that is neither traumatic nor physical— in fact, as both Dr. Player and Dr. Bell testified, the origin of a disease is not specifically identifiable. We

would observe that if a different or more precise definition of "disease" is to be made in the field of the Workers' Occupational Diseases Act, it should be made by the legislature.

■ According to the record in the case at bar, carpal tunnel syndrome is shown to be a set of symptoms, *i.e.*, numbness, tingling, and weakness, caused by pressure on the nerves running through the wrist. Both doctors in the instant case testified that such pressure results from the swelling of the contents of the carpal tunnel; however, neither doctor could specify the causation of such swelling. Dr. Player testified that claimant's condition could have been caused by degenerative changes in claimant's spine. As previously stated, Dr. Player also testified that carpal tunnel syndrome is not a disease because calling it a disease "would imply that there was a definite cause creating a definite known ill effect," and that the cause of carpal tunnel syndrome "is not entirely worked out"; and Dr. Bell testified that he did not consider carpal tunnel syndrome to be a "disease process" because it is "a swelling of a non-specific origin."

We conclude, therefore, that claimant failed to establish that he suffered from a disease within the meaning of the Workers' Occupational Diseases Act. Our decision in this regard comports with the recent decision of our supreme court in *Peoria County Belwood Nursing Home v. Industrial Com.* (1987), 115 Ill. 2d 524. In *Belwood* an award under the Workers' Compensation Act for carpal tunnel syndrome as an accidental injury was affirmed; therefore, the absence of a remedy for carpal tunnel syndrome is not a consideration in the case at bar. See *Allis-Chalmers Manufacturing Co. v. Industrial Com.* (1965), 33 Ill. 2d 268, 272, 211 N.E.2d 276, 278-79 (occupational disease law designed to supplement workers' compensation law).

Although claimant originally filed his claims under the Workers' Compensation Act, at the arbitration hearing he requested that they be considered under the Workers' Occupational Diseases Act (Ill. Rev. Stat. 1983, ch. 48, par. 138.19(a)(1)). Both sections 19(a)(1) and (2) of the Workers' Compensation Act and section 19(a)(1)(F) of the Workers' Occupational Diseases Act provide that a claim may be amended from one act to the other "at any time before final disposition of such cause" (Ill. Rev. Stat. 1983, ch. 48, pars. 138.19(a)(1), 172.54(a)(1)(F)); therefore, there was no error in the granting of such request.

Finally, in the alternative, claimant requests that we reverse and remand this cause to the Industrial Commission for reconsideration of his claim under the Workers' Compensation Act in light of the decision of the supreme court in *Peoria County Belwood Nursing Home v. Industrial Com.* (1987), 115 Ill. 2d 524, which was announced subse-

quent to the Commission's decision in this case. Central Wisconsin Transport and Grow Mart contend that it is impermissible to consider claimant's claim under the Workers' Compensation Act because claimant has failed to meet the notice requirements of the Workers' Compensation Act.

The record indicates that the Industrial Commission determined that claimant failed to establish a claim under the Workers' Compensation Act because "[claimant] did not allege or establish any specific time, place, or cause constituting an accidental injury, or any sudden giving way of his bodily structure as the result of repetitive trauma constituting an accidental injury within the meaning of the [Workers' Compensation Act] nor does medical opinion in the record support such a conclusion."

■ However, as previously stated, subsequent to the Commission's decision in the case at bar, our supreme court in *Peoria County Belwood Nursing Home v. Industrial Com.* (1987), 115 Ill. 2d 524, determined that an employee may be "accidentally injured" under the Workers' Compensation Act as the result of repetitive, work-related trauma even absent a final, identifiable episode of collapse. (115 Ill. 2d 524, 530-31.) Thus, in the case of repetitive trauma, it is no longer necessary for an employee to establish a specific time, place, or cause of an accidental injury, nor is it necessary to establish a sudden giving way of the employee's bodily structure.

■ Regarding claimant's alternative request that his claim be considered as an "injury" under the Workers' Compensation Act under *Peoria County Belwood Nursing Home*, such relief is authorized by the provisions of section 19(a)(2) of the Workers' Compensation Act (Ill. Rev. Stat. 1985, ch. 48, par. 138.19(a)(2)); and under similar circumstances, we have remanded occupational disease claims to the Industrial Commission for consideration under the Workers' Compensation Act. (*Downs v. Industrial Com.* (1986), 143 Ill. App. 3d 383, 389-90, 493 N.E.2d 595, 600.) We conclude that remand of the instant case is necessary by reason of the fact that the decision in *Peoria County Belwood Nursing Home* permits consideration of the employee's claim as an injury without his establishing a specific time, place or cause of such injury or the sudden giving way of his bodily structures.

■ Upon reconsideration on remand, the Industrial Commission will be in a position to make a determination as to whether proper notice has been given the employers as required by the Workers' Compensation Act. In this regard, section 6(c) of the Workers' Compensation Act provides that: "Notice of the accident shall be given to the

employer as soon as practicable, but not later than 45 days after the accident." (Ill. Rev. Stat. 1981, ch. 48, par. 138.6(c).) In *Belwood*, the supreme court specifically determined that "the date of an accidental injury in a repetitive-trauma compensation case is the date on which the injury 'manifests itself'" and that "'[m]anifests itself' means the date on which both the fact of the injury and the causal relationship of the injury to the claimant's employment would have become plainly apparent to a reasonable person." (*Peoria County Belwood Nursing Home v. Industrial Com.* (1987), 115 Ill. 2d 524, 530-31.) This test obviously is an objective one and is to be determined from the facts and circumstances of each case. The onset of pain and the inability to perform one's job are among the factors considered on this issue.

For the foregoing reasons, the judgment of the circuit court confirming the Industrial Commission's denial of benefits under the Occupational Diseases Act is affirmed; however, the cause is remanded to the Industrial Commission for consideration as an accidental injury under the rationale of *Peoria County Belwood Nursing Home v. Industrial Com.* (1987), 115 Ill. 2d 524.

Affirmed in part and remanded with directions.

BARRY, P.J., and McCULLOUGH, McNAMARA, and WOODWARD, JJ., concur.