OLD BEN COAL COMPANY, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Clifford Frye, Appellee).

Fifth District (Industrial Commission Division)   No. 5—90—0376WC

Opinion filed May 16, 1991.—Rehearing denied July 5, 1991.

L. Robert Mueller, of Livingstone, Mueller, O'Brien & Davlin, P.C., of Springfield, for appellant.

Harold B. Culley, Jr., of Culley & Associates, of Raleigh, for appellee.

JUSTICE LEWIS delivered the opinion of the court:

The employer, Old Ben Coal Company, appeals from the judgment of the circuit court confirming the decision of the Illinois Industrial Commission (hereafter referred to as the Commission). The Commission affirmed the decision of the arbitrator, which found the claimant, Clifford Frye, permanently and totally disabled pursuant to the terms of the Workers' Occupational Diseases Act (Ill. Rev. Stat. 1981, ch. 48, par. 172.36 *et seq.*) (hereafter referred to as the Act). The Commission found a causal relationship existing "between the exposure to the hazards of an occupational disease, coal dust, and [claimant's] occupational disease of pneumoconiosis."

The employer presents two issues for review: (1) whether the Commission should have denied claimant benefits on the basis of section 1(f) of the Act (Ill. Rev. Stat. 1981, ch. 48, par. 172.36(f)), pertaining to the requirement that disablement must occur within two years after the last day of the last exposure to the hazards of the occupational disease, and (2) whether the decision of the Commission that the claimant is permanently and totally disabled as a result of occupational pneumoconiosis is against the manifest weight of the evidence. The claimant raises the issue whether the circuit court lacked subject matter jurisdiction because the employer's written request for summons "neither named Clifford Frye as a party in interest, nor included his last known address as required by statute."

■■ In Illinois a circuit court's jurisdiction to review a decision of the Commission is a special statutory power, limited by the statute's provisions. (*Chadwick v. Industrial Comm'n* (1987), 154 Ill. App. 3d 859, 507 N.E.2d 878.) Section 19(f)(1) of the Act (Ill. Rev. Stat. 1989, ch. 48, par. 172.54(f)(1)) provides in pertinent part:

"A proceeding for review shall be commenced within 20 days of the receipt of notice of the decision of the Commission. The summons shall be issued by the clerk of such court upon written request returnable on a designated return day, not less than 10 or more than 60 days from the date of issuance thereof, and the written request shall contain the last

known address of other parties in interest and their attorneys of record who are to be served by summons."

The employer's written request for summons, filed November 7, 1989, states as follows:

"TO THE CLERK OF THE COURT:

Please issue a summons to the Industrial Commission of Illinois to certify to this Court on or before January 16, 1990 the transcript of all proceedings, in the case of Clifford Frye v. Old Ben Coal Company, Industrial Commission No. 85—WC—45230 (89 IIC 852). The Decision of the Industrial Commission was received by this Plaintiff or its attorney on November 1, 1989.

Also issue a Summons directed to Harold B. Culley, Jr. and Wayne R. Reynolds, Attorneys for Clifford Frye, returnable on January 16, 1990.

The name and last known address of the parties in interest and his attorneys of record are: ***."

The employer then provided the names and last known addresses of the Commission, Wayne R. Reynolds, and Harold B. Culley, Jr. The employer's attorney signed the request.

Summons was issued by the clerk of the court "TO EACH DEFENDANT" in the case, styled "OLD BEN COAL COMPANY, PLAINTIFF, -VS- INDUSTRIAL COMMISSION OF ILLINOIS, and CLIFFORD FRYE, DEFENDANT." The request for summons was styled in the same way. The certificate signed by the clerk of the court states that a copy of the summons was mailed to the Commission and to Harold B. Culley, Jr., and Wayne R. Reynolds, whose addresses are included.

On December 12, 1989, the claimant's attorneys, having entered their special and limited appearance on behalf of the claimant, moved to quash the return of service upon them, asking that the matter be dismissed with prejudice for lack of jurisdiction. The motion stated that the claimant had not been designated as a party in interest and his last known address was not listed and that the clerk of the court had not issued a summons directed to claimant. The motion stated further that "service of Summons on said attorney is not service on CLIFFORD FRYE for the reason that CLIFFORD FRYE was not designated as a party in interest nor was his last known address listed."

The circuit court denied the claimant's motion to quash, noting that "the request for summons names the Industrial Commission and 'Harold B. Culley, Jr. and Wayne R. Reynolds, attorneys for

Clifford Frye,' setting forth the addresses of Culley and Reynolds."
The circuit court observed further that

> "[i]n this case, the clerk evidently understood the summons
> sufficiently that a summons was addressed 'to each defend-
> ant.' The caption named, as defendants, Industrial Commis-
> sion of Illinois and Clifford Frye.
>
> While, ordinarily, the case caption would add nothing to the
> complaint or pleading, of which it was a part in this regard,
> the request for summons itself is the critical document and
> Clifford Frye is named in the body of the request twice and
> in the caption once, and the certificate of service by the clerk
> names Culley and Reynolds as attorneys of record.
>
> It would seem, therefore, under the rule, that Clifford Frye
> has received the notice required by the statutory scheme."

The court stated further that the record shows claimant's attorneys
received the notice and that they must have done so in their capac-
ity as attorneys for a party, namely, the claimant.

On review the claimant takes the position that because the em-
ployer failed to comply strictly with the requirements of section 1
of the Act with respect to the contents of the request for summons,
the circuit court lacked jurisdiction to entertain the appeal. The em-
ployer relies upon *Chadwick v. Industrial Comm'n* (1987), 154 Ill.
App. 3d 859, 507 N.E.2d 878, and argues that, like the appellant in
*Chadwick*, it provided sufficient information for the clerk to notify
the employee and his attorneys of the pending appeal properly. The
employer argues further that, as in *Chadwick*, there is no indication
or suggestion here that the employee has been prejudiced in any
way as a result of the employer's failure to include the employee's
address in the request for summons.

In *Chadwick* we decided that a motion to quash had been im-
properly granted where the claimant's written request for summons
substantially complied with the requirement of section 19(f)(1) of
the Workers' Compensation Act (Ill. Rev. Stat. 1985, ch. 48, par.
138.19(f)(1)). The claimant in *Chadwick* sought review of the Com-
mission's decision in the circuit court, which granted the respond-
ent's motion to quash, finding that it did not have jurisdiction to
hear the cause because the claimant had failed to comply strictly
with section 19(f)(1). The written request for review included a
*praecipe* for a writ of *certiorari* and a writ of *scire facias*, a certif-
icate of mailing, a writ of *certiorari* and a writ of *scire facias*. In
the *praecipe*, the respondent was named as a party in interest, but
its address was not given. The *praecipe* gave the name and address

of the respondent's attorney of record, however, and the respondent's name and address were listed on the certificate of mailing. In determining whether a *praecipe* or written request is sufficient where only the name and not the address of the party in interest is listed, we considered the observation of the supreme court in *Republic Steel v. Industrial Comm'n* (1964), 30 Ill. 2d 311, 196 N.E.2d 654, that the tendency of the courts has been to simplify procedure, to honor substance over form, and to prevent technicalities from depriving a party of the right to be heard. We concluded in *Chadwick* that, although the claimant had not complied strictly with the requirement of section 19(f)(1) that the *praecipe* list the last known address of the party in interest, she had given sufficient information in the *praecipe* and the certificate of mailing for the clerk properly to have notified the respondent and its attorney of the pending appeal. "Most significantly," we said, "the respondent has not shown that it was in any way prejudiced by the missing address." (*Chadwick,* 154 Ill. App. 3d at 862-63, 507 N.E.2d at 881.) Because the claimant's *praecipe* complied substantially with the material provisions of section 19(f)(1), we reversed the order quashing the writs.

Recently, in *Advance Transportation Co. v. Industrial Comm'n* (1990), 202 Ill. App. 3d 449, 559 N.E.2d 1038, we considered the issue whether a respondent's failure to designate the return date on the request for summons prevents a circuit court from obtaining subject matter jurisdiction over the case. There we concluded that, taken *in toto*, the facts demonstrated that respondent had complied sufficiently with section 19(f)(1) of the Workers' Compensation Act so that the claimants and their attorney had been properly notified of the pending appeal. In *Advance* we distinguished the recent case of *Whitmer v. Industrial Comm'n* (1989), 187 Ill. App. 3d 409, 549 N.E.2d 353, in which the claimant had failed to file a written request for summons. In *Whitmer* we reasoned that the written request in *Chadwick* had been imperfectly completed as opposed to the claimant's failure in *Whitmer* to file a written request. The respondent in *Advance,* we observed, like the claimant in *Chadwick,* had submitted an incomplete written request for summons rather than no request at all. We concluded that the respondent in *Advance* was in substantial compliance with section 19(f)(1) despite its failure to designate a return date on the request for summons.

In the further case of *Luttrell v. Industrial Comm'n* (1987), 154 Ill. App. 3d 943, 507 N.E.2d 533, the claimant filed for review on outdated forms after section 19(f)(1) had been amended by the legis-

lature to require the use of summons instead of *praecipes* and writs. We determined that mere use of incorrect forms did not deprive the circuit court of subject matter jurisdiction because there was no significant distinction between a written request for summons and a *praecipe*. In *Whitmer* we noted that neither *Luttrell* nor *Chadwick* was analogous to the situation in *Whitmer* since in both *Luttrell* and *Chadwick* written requests, although imperfectly drawn, were actually filed, whereas in *Whitmer* no written request was filed at all.

■ In the instant case, as in *Chadwick* and in *Advance*, the employer provided in its request for summons sufficient information for the clerk properly to notify claimant and his attorneys of the pending appeal. Further, and significantly, claimant has shown no prejudice as a consequence of the employer's omission. The respondent here, like the parties making a written request for summons in both *Chadwick* and *Advance*, submitted an incomplete written request rather than none at all. Under all of these circumstances the respondent appears to have been in substantial compliance with the material provisions of section 1 of the Act. Thus, the circuit court did not lack subject matter jurisdiction over the cause of action, and it properly denied the claimant's motion to quash.

At the hearing before the arbitrator conducted on April 19, 1988, the claimant testified that he was born on August 26, 1923, and last worked as a coal miner on July 16, 1982, when he was exposed to and breathed coal dust. On that date he had worked 39 years and about 10 months as a coal miner, all but three years of which he had worked underground. He had worked "[e]very job," he said, "from laborer to mine superintendent." He had worked for the employer from March 17, 1975, until July 16, 1982. During that time he had worked underground as an "assistant mine manager." He described the position as "section boss at the face, preparation boss at the face, production boss at the face." He had been exposed to coal dust "[r]eal bad," so that "sometimes you couldn't see a light six (6) inches from your head, real bad, continuous miner." He described the large amount of dust created by the cutter wheels of the continuous mining machine cutting at the face, where he worked. Asked why he had stopped working on July 16, 1982, the claimant answered, "Disabled." He stated, "The last two (2) years I worked, this job was getting so hard to do I just almost couldn't do it," in part, because of the amount of walking required. "[T]he job got real hard to do," he said,

"and the last [on July 16, 1982], I was working second shift and the last shift I worked when I come home, I just couldn't breath [sic]. I mean, I just couldn't, I couldn't breath [sic]. So I, I didn't work on the Saturday. That was on a Friday night. So on the Monday, I went to the doctor. They sent me for breathing tests and x-rays and all this deal you go through with and the doctor recommended then that I quit mining."

He testified that his breathing problems have become worse since he stopped working, stating, "I can't walk to that door over there." He had smoked cigarettes at the rate of approximately a pack a day for about 35 years.

The evidence deposition of Dr. Penny Tippy, formerly Dr. Patton, taken on behalf of the claimant on September 9, 1987, was admitted into evidence. Dr. Tippy, a family practitioner, began to treat the claimant on July 20, 1978. She first treated him for a respiratory problem, namely, chronic bronchitis, on October 5, 1978. An X ray taken in November of 1979 demonstrated pulmonary fibrosis, which she described as "[f]ibrotic changes around the middle of each lung field." An X ray taken in July of 1982 demonstrated chronic obstructive pulmonary disease, which the witness described as "a disease in which the patient can't get enough oxygen and can't breathe out the carbon dioxide."

The results of pulmonary function studies performed on December 17, 1979, revealed "[s]ignificant obstructive and restrictive lung disease with moderate improvement following bronchial dilators." "Restrictive," the witness said, "is you can't breathe in; obstructive is you can't get it out." Subsequent pulmonary function studies performed on July 27, 1982, and May 10, 1985, had the same findings, which were abnormal and consistent with chronic obstructive lung disease. The witness characterized the results of the claimant's pulmonary function studies as "[s]evere, but primarily I base that on what the pulmonologist tells me he reads." An arterial blood gas study performed in March of 1985 revealed abnormal values consistent with chronic obstructive lung disease.

Pertinent physical findings of the witness were: "[G]enerally has an increase in the A/P diameter of his chest, which is consistent with chronic obstructive lung disease. He usually has rhonchi and some wheezing, and that varies from visit to visit." The claimant's history of smoking was 35 to 40 pack-years or about a pack per day for 35 years until 1982, when it was reduced to about a half a pack per day or less.

The witness considered a history of smoking 35 years significant and a history of exposure to coal dust for 35 years significant. She testified that, based upon a reasonable degree of medical certainty, the claimant has emphysema, chronic bronchitis, and pneumoconiosis. She described the pneumoconiosis as secondary to coal mining and the chronic obstructive lung disease as secondary to coal mining and smoking. In her diagnosis, she said, coal workers' pneumoconiosis is "an element of chronic obstructive pulmonary disease along with chronic obstructive bronchitis and emphysema." She testified further that the claimant is impaired as a result of his respiratory distress and that his impairment would preclude him from being gainfully employed as a coal miner. In her opinion claimant is disabled from working as a coal miner. The inhalation of coal dust will, she said, cause emphysema and chronic bronchitis and will aggravate both of these conditions. In her opinion continued inhalation of coal dust would be injurious to the claimant's health. She described coal workers' pneumoconiosis as a chronic, irreversible lung disease with no known cure. Asked, "What is the best treatment for coal workers' pneumoconiosis?" she answered, "Get them out of the coal dust." Since he stopped working as a coal miner in the summer of 1982, claimant has had "no infection"; prior to that time treatment with antibiotics had been necessary for a bronchitis infection. The witness was not able to "quantify" the contribution of each of the three conditions from which the claimant suffers, namely, emphysema, chronic bronchitis, and coal workers' pneumoconiosis, to his respiratory distress.

On cross-examination she testified that emphysema and bronchitis are sometimes referred to as "smoker's disease" because the inhalation of smoke can cause inflammation leading to bronchitis or emphysema; a person could have these conditions and never have been around a coal mine. Smoking, she said, can make chronic obstructive lung disease "worse faster." On redirect examination she stated that nonsmokers can have emphysema and that the claimant has both emphysema and coal workers' pneumoconiosis, the latter of which was caused by the inhalation of coal dust.

The evidence deposition of Dr. P.B. Sanjabi taken on behalf of the claimant on August 28, 1988, was also admitted into evidence. Dr. Sanjabi's practice consists primarily of pulmonary medicine. In his practice he treats miners who are affected with coal workers' pneumoconiosis. He had examined the claimant in September and October of 1981, and in February of 1986. He saw the claimant in September of 1981, upon a referral from Dr. Patton, because of

complaints of shortness of breath, cough, and sputum production. A pulmonary function test was performed, medications were prescribed and instructions were given. Concerning a diagnosis at that time, the witness stated, "Basically we were worried about chronic obstructive lung disease at that time in general." When he saw the claimant in October of 1981, he had stopped smoking.

When the witness saw claimant next, on February 17, 1986, the claimant's main complaint was shortness of breath:

> "[W]hen we tried to quantify the level of shortness of breath it was stressed that he cannot walk more than half a block on a level surface without getting dyspneic, short of breath. He also stated that he had shortness of breath when he does his daily routine work and simple things such as taking a shower or grooming himself."

Dr. Sanjabi testified that the claimant had a history of smoking of about 40 pack-years "altogether" and of working under ground in a coal mine "over 39 years"; he considered this history significant. He described the claimant's chest shape as "abnormal somewhat" with an "increased anterior posterior diameter." There was a "general decrease" in the expansion of the chest. In clinical measurement of expiratory time, the claimant took 13 or 14 seconds to take a deep breath and force the air out of his lungs, whereas a normal person usually takes less than three seconds to do so. The general finding of the pulmonary function test was, he said, "very much in keeping with obstructive pattern of severe degree." He had concluded, he testified, that "this pulmonary function test was compatible with severe obstructive pattern." In an X ray taken on April 22, 1985, which the claimant had brought with him, Dr. Sanjabi had noticed "alveolar interstitial changes bilaterally which were compatible or suggestive of coal worker's pneumoconiosis." In the X ray Dr. Sanjabi also noticed "scarring and emphysematous changes."

Comparing the results of "arteriole" blood gas studies performed by others upon the claimant, Dr. Sanjabi testified that there was "considerable change" between two such studies, performed in March of 1983 and in May of 1985. He found that "the exercise blood gases are abnormal in 1983" and that the subsequent test in 1985 revealed "a totally abnormal blood gases. It is quite a change as compared to two years ago. Both in resting and with exercise the abnormalities are significant."

In the opinion of Dr. Sanjabi the claimant suffered from coal workers' pneumoconiosis caused by his having "worked 40 years in

the coal mines." In his opinion the claimant suffers from a "[s]evere" respiratory impairment. In his further opinion coal workers' pneumoconiosis was "a contributing factor" in the claimant's respiratory impairment. Describing coal workers' pneumoconiosis as an incurable, irreversible chronic lung disease, he discussed the best treatment for the disease:

> "We recommend to people with a significant degree of coal workers' pneumoconiosis to avoid exposure to respirable particles and we also give them bronchodilators of different kinds, if necessary, and try to prevent deterioration."

In the opinion of Dr. Sanjabi, the inhalation by claimant of coal dust would aggravate that condition. Given the degree of claimant's respiratory distress, the witness doubted that he could be gainfully employed as a coal miner.

On cross-examination Dr. Sanjabi indicated that emphysema and bronchitis are two of the several diseases comprising the category of obstructive lung disease. The diseases that Dr. Sanjabi had found relative to the claimant's obstructive lung disease were emphysema and coal workers' pneumoconiosis. He testified that in a letter of February 17, 1986, he had stated that the claimant had a "mild, simple pneumoconiosis," which, he testified, is not, in itself, indicative of any disability. Smoking would, he said, enhance the problem of pneumoconiosis: "By theory it should enhance the problem because the smoking effects the cleansing system of the lung and the coal dust is cleared by this system. One can say that it would enhance the problem." A person with a long smoking history would be more apt to acquire pneumoconiosis, and smoking by a person who had acquired pneumoconiosis would aggravate the condition.

On redirect examination the witness distinguished simple pneumoconiosis from complicated pneumoconiosis, which he described as "progressive massive fibrosis." Simple pneumoconiosis, however, can produce severe lung impairment. The claimant suffers from three lung diseases, namely, chronic bronchitis, emphysema, and coal workers' pneumoconiosis, which are "contributing factors" to his "severe obstructive pattern." The witness was unable to "quantify" the percentage that each disease contributed to claimant's overall respiratory difficulties, stating, "There is no way to go in there and say in this man so many percentage is coming from this or so many percentage is coming from that. There is no conceivable possible way to do that." He expressed the opinion that the claimant's coal workers' pneumoconiosis is a "contributing factor" to his severe, advanced, chronic obstructive pulmonary disease.

The evidence deposition of Dr. Jeffrey W. Selby, taken on behalf of the employer on January 26, 1988, was admitted into evidence. Dr. Selby, a pulmonary specialist, board certified in internal medicine and pulmonary medicine, had examined the claimant for the employer on May 10, 1985. He described pneumoconiosis as "a condition resulting in scarring and dysfunction of the lung as a result of inhaled dust." He testified that a chest X ray taken the day of the examination revealed "a mild interstitial pattern of rounded opacities; no large opacities or hilar calcifications noted." To the witness the fact that some small but no large opacities were seen indicated "that probably it could be looked upon as a degree of pneumoconiosis." He explained that

> "[i]f there are large opacities that are thought due to pneumoconiosis, it usually requires a very significant exposure and a very significant reaction in the lungs to get a large opacity. Small opacities are usually associated with very minimal exposure or very minimal reaction of the lungs to the exposure."

The witness thought that the pneumoconiosis suffered by the claimant was "an extremely mild form" of the disease. He thought that "there was enough abnormality to term this a 0/1, p/p classification under the ILO Standards," which he explained as follows:

> "Well, that gets kind of technical, but it would indicate that the small opacities are of the smallest size of opacities—being three different classifications of small opacities, and that it was of very minimal profusion, which means the actual volume of opacities in the lung fields, and, for example, 0/0 would be normal chest X-ray; 3/3 would be the very worst, and this was towards the very minimal end of the spectrum."

He stated, "I think significantly the X-rays showed evidence of chronic obstructive pulmonary disease," which he described as "a very common condition, for example, just to make it simple, emphysema and asthma and chronic bronchitis are the main players in chronic obstructive pulmonary disease."

The witness stated his general impression of what pulmonary function studies, which were performed at the time of the examination, revealed:

> "I think that these studies were consistent with a severe degree of obstruction that was partially reversible by a bronchodilator, where the patient inhaled a bronchodilator and then the test reperformed; that they showed a mild degree of restrictive defect based on the lung volumes, and they showed

a severe decrease in diffusion capacity. And this indicated to me that the patient was not fully bronchodilated; that perhaps he was being suboptimally treated for his reversible airways obstruction, which I'll term asthma. And that he had a great degree of emphysema based on the pattern of the pulmonary function test, and also based on the abnormal diffusion capacity, which quite commonly is decreased in emphysema."

The witness had reached the following conclusions concerning the claimant's health:

"I thought that Mr. Frye had an overwhelming amount of pulmonary impairment or abnormality. I thought that this was almost entirely due to a combination of emphysema and asthma; that the emphysema was entirely due to his cigarette smoking and perhaps his genetic make-up; that his asthma was entirely due to his genetic make-up and whatever environmental factors may have been involved; that his asthma was not being optimally treated; that he also had some pulmonary impairment from a recent probable viral and/or bacterial bronchitis that could have played a significant role in his worsening at the time of this evaluation; that he had exercise induced bronchospasm, that was brought forth during the exercise test; and that he had a chest X-ray that was not entirely normal, but that was very minimally abnormal that was consistent with inhaled dust in his past, and that I thought that that was playing a very minimal, if any, significant role in his pathophysiology of shortness of breath."

On cross-examination the witness testified that the claimant has a "severe pulmonary abnormality." He expressed the view that the continued inhalation of coal dust by the claimant was "not very likely to play a major role in aggravating" the emphysema from which he suffers. He stated that coal workers' pneumoconiosis "could" be a component of the claimant's chronic obstructive pulmonary disease. Dr. Selby testified that he and Dr. Eugene Hendershot, a board-certified radiologist, had a "[m]inor disagreement" in their interpretations of the X ray taken on May 10, 1985, which Dr. Hendershot read as "positive for pneumoconiosis." The witness stated that "[a]t the time" he had disagreed with Dr. Hendershot's assessment. Dr. Selby had assessed the degree of profusion to be less than that determined by Dr. Hendershot, which was "1/1." Included in the record is the employer's evidence deposition exhibit No. 2, which bears Dr. Hendershot's impression of the X ray: "Pul-

monary fibrosis and emphysema. Evidence of pneumoconiosis." The witness testified that if he were the claimant's primary health care physician, he would not recommend that he not be exposed to a dusty environment "until I had the opportunity to optimally treat him, and decide that I could not make him better by proper bronchodilators, etc."

No additional evidence was presented on review before the Commission, which, in its decision dated October 27, 1989, affirming that of the arbitrator, found, in part, as follows:

> "9. The Commission finds, consistent with the Illinois Workers' Occupational Disease Act, that since the [claimant] worked in one or more coal mines for a period of 10 years or more, there is a rebuttable presumption that his pneumoconiosis arose out of such employment. [The employer] failed to rebut this presumption.
>
> 10. The Commission relies on the opinions and/or admissions of Drs. Tippy, Sansabi [sic][,] Hendershot[,] and Selby, in finding a causal relationship exists between the exposure to the hazards of an occupational disease, coal dust, and [claimant's] occupational disease of pneumoconiosis and need for medical services. The Commission assigns the most weight to the medical opinion of Dr. Tippy. The Commission further finds that there is no competent and compelling evidence that the [claimant's] condition is not work related."

The Commission found further that the claimant is totally disabled and unable to perform any services without seriously endangering his health or life, except those that are so limited in quantity, dependability or quality, that there is no reasonable stable market for them. In reaching this finding the Commission considered the claimant's age, physical condition, experience, and education.

It is the function of the Commission to resolve disputed questions of fact, including those of causal connection, to decide which of conflicting medical views is to be accepted and to draw permissible inferences. (*Material Service Corp. v. Industrial Comm'n* (1983), 97 Ill. 2d 382, 454 N.E.2d 655.) In the presence of conflicting medical opinion, the Commission's determination is given substantial deference and will be upheld unless it is contrary to the manifest weight of the evidence. (*Material Service Corp.*, 97 Ill. 2d 382, 454 N.E.2d 655.) The Commission is the judge of the credibility of witnesses. (*Caterpillar Tractor Co. v. Industrial Comm'n* (1983), 97 Ill. 2d 35, 454 N.E.2d 252.) It is the peculiar province of the Commission not only to determine the credibility of witnesses

but also to weigh the testimony and to determine the weight to be given to the evidence. (*Berry v. Industrial Comm'n* (1984), 99 Ill. 2d 401, 459 N.E.2d 963; *Dunker v. Industrial Comm'n* (1984), 126 Ill. App. 3d 349, 466 N.E.2d 1255.) A reviewing court should neither overturn the Commission's findings simply because a different inference could be drawn nor otherwise substitute its judgment for that of the Commission. *Hoegger v. Industrial Comm'n* (1987), 158 Ill. App. 3d 1025, 512 N.E.2d 110.

■■ ■ An accidental injury arises out of and in the course of employment if some act or phase of the employment was a causative factor in the ensuing injury; the claimant need not prove that it was the sole causative factor but only that it was a causative factor in the resulting injury. (*Interlake, Inc. v. Industrial Comm'n* (1981), 86 Ill. 2d 168, 427 N.E.2d 103.) An employee is totally and permanently disabled when he is unable to make some contribution to the work force sufficient to justify the payment of wages. (*Interlake*, 86 Ill. 2d 168, 427 N.E.2d 103.) However, an employee is not required to demonstrate total incapacity or helplessness before a permanent total disability award may be granted. (*Interlake*, 86 Ill. 2d 168, 427 N.E.2d 103.) A claimant is totally disabled when he cannot perform any services except those that are so limited in quantity, dependability, or quality that there is no reasonably stable market for them; conversely, if an employee is qualified for and capable of obtaining gainful employment without seriously endangering his health or life, he is not entitled to total and permanent disability compensation. *Interlake*, 86 Ill. 2d 168, 427 N.E.2d 103.

■■ In the instant case the record shows that it was not against the manifest weight of the evidence for the Commission to have found the claimant permanently and totally disabled as a result of occupational pneumoconiosis. The testimony of the claimant, whom the Commission expressly found to be "highly credible," together with that of Drs. Tippy and Sanjabi, supports such a finding. Even the testimony of Dr. Selby, particularly upon cross-examination, supports such a result. Drs. Tippy and Sanjabi clearly indicate that the pneumoconiosis suffered by the claimant was caused by exposure to coal dust during the course of his employment as a coal miner and is a contributing factor to the severe respiratory impairment and consequent disability he experiences. The Commission was entitled to rely upon this evidence, and its decision, contrary to the employer's assertions, was not erroneous.

The employer maintains that the claimant failed to prove that the disablement occurred within two years after the last day of the

last exposure to the hazards of the occupational disease, as required by section 1(f) of the Act. However, the testimony of the claimant taken together with that of Dr. Tippy, in particular, reveals that he was, in fact, disabled when he last worked on July 16, 1982. He testified to the increasing difficulties he had experienced on the job for two years prior to ceasing work, to the inability to breathe when he returned home from work on July 16, 1982, and to the advice of his physician within three days thereafter that he "quit mining" as a result of his condition. The testimony of Dr. Tippy corroborated claimant's statements concerning his condition at that time and thereafter. If anything, claimant's condition has become worse since that time. The position of the employer is not borne out by the record.

The judgment of the circuit court confirming the decision of the Commission should be affirmed.

Affirmed.

McCULLOUGH, P.J., and McNAMARA, WOODWARD, and STOUDER, JJ., concur.